

FILED

JUN 0 7 2013

CLERK

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | | |
|---|---|---|
| JOHN REINTS,<br>     Plaintiff,<br>v.<br><br>CITY OF RAPID CITY, SOUTH DAKOTA;<br>TRAVELERS INSURANCE COMPANIES, INC;<br>JASON GREEN individually & in his official capacity;<br>BRAD SOLON individually & in his official capacity;<br>JOEL LANDEEN individually & in his official capacity;<br>WADE NYBERG individually & in his official capacity;<br>ANDY CHLEBECK individually & in his<br>    official capacity;<br>RON SASSO individually and in his official capacity;<br>JANE DOE AKA "CHRISTINE O'BRIEN" individually;<br>KEITH L'ESPERANCE individually & in his<br>    official capacity;<br>JIM SHAW in his former official capacity;<br>ALAN HANKS in his former official capacity;<br>SAM KOOIKER in his official capacity;<br>BONNY PETERSON in her official capacity;<br>DAVE DAVIS in his official capacity;<br>JERRY WRIGHT in his official capacity;<br>GARY BROWN in his official capacity;<br>CHARITY DOYLE in her official capacity;<br>STEVE LAURENTI in his official capacity;<br>RITCHIE NORDSTROM in his official capacity;<br>JORDON MASON in his official capacity;<br>JOHN ROBERTS in his official capacity;<br>PAULINE SUMPTON in her official capacity;<br>JANE DOE AKA "CONNIE" in her official capacity;<br>GARY GARNER in his official capacity<br>BARB GARCIA in her official capacity<br>JEFF BARBIER in his official capacity<br>BRETT LIMBAUGH in his official  capacity<br>JANE & JOHN DOES 3-25 individually & in their<br>    official capacities;<br><br>    Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civ. No. _13-5043_<br><br><br><br>**COMPLAINT**<br><br><br><br><br><br>**PLAINTIFF DEMANDS**<br><br>**A JURY TRIAL** |

1.    This action arises under 42 USC §1983, 42 USC §1988, the First, Fifth and
Fourteenth Amendments to the United States Constitution, Article VI §1, §2
and§4 of the Constitution of South Dakota, and other provisions of state, federal
and common law.  This Court has jurisdiction pursuant to 28 USC §1343(a)(3)
and 28 USC §1331 and supplemental jurisdiction pursuant to 28 USC §1367.

2.    Plaintiff John Reints (Reints) seeks compensatory damages for violations of his
Constitutional procedural and substantive due process rights, for denial of his
Constitutional right to equal protection of the laws by outrageous singling-out of
Reints in order to "get" and retaliate against him personally for reasons unrelated
to any legitimate purpose of government, for retaliation for exercise of his First
and Fourteenth Amendment rights, for the destruction and/or confiscation of his
property without due process of law, without hearing and without compensation,
and for extensive and repeated violations of his liberty interest in being able to
make and peacefully enjoy a home in Rapid City in his retirement, by the City of
Rapid City through its officials and agents acting under color of law.

3.    Reints also seeks punitive damages individually against those of the same
officials and agents, and "individually" against an insurance company together
with its representative who acted jointly with the City, who have acted
maliciously under color of law, and conspired with each other, to knowingly
violate or prevent the exercise of Reints' fundamental rights, to destroy and/or
confiscate Reints property while fully aware that the destruction and/or
confiscation were in violation of Reints' fundamental rights, and to knowingly,
unlawfully and outrageously interfere with Reints ability to make and peacefully
enjoy a home.

4.    Finally, Reints seeks equitable relief to cause the City to remove all special
assessments against his home and its premises based on defective notices,
unlawful abatements and related, unlawfully imposed special assessments, and to
prevent the City from continuing to issue such notices to him and to cause the

City to cease such abatements.

## PARTIES

5.    Defendant City of Rapid City is an incorporated municipality with governmental authority under the laws of the state of South Dakota.

6.    Defendant Travelers Insurance Companies, Inc., is a multi-national business organization incorporated in the state of Minnesota with principal offices at 485 Lexington Avenue, New York, N.Y. 10017, doing business in South Dakota. It is the liability insurance carrier for Defendant City of Rapid City.. Jane Doe No. 1 AKA "Christine O'Brien" is Claims Representative for Travelers Insurance Companies, Inc.

7.    Defendant Jason Green was employed as City Attorney for the City of Rapid City between 2003 and September 9, 2011.

8.    Defendant Brad Solon is employed as Building Official for the City of Rapid City.

9.    Defendant Joel Landeen is employed as City Attorney for the City of Rapid City and previously served as Assistant City Attorney.

10.    Defendant Andy Chlebeck is employed as an Ordinance Enforcement Officer for the City of Rapid City.

11.    Defendant Ron Sasso is an elected Alderman, or member of the Common Council, of the City of Rapid City.

12.    Defendant Jane Doe No. 1 AKA Christine O'Brien is a claims representative for Travelers' Insurances Companies, Inc.

13.    Defendant Keith L'Esperance is employed as Risk Manager for the City of Rapid City.

14.    Defendants Jim Shaw and Alan Hanks are former elected Mayors of the City of Rapid City.

15.    Defendant Sam Kooiker is the elected Mayor of the City of Rapid City and formerly served as an elected Alderman.

16.    Defendants Bonny Peterson, Dave Davis, Jerry Wright, Gary Brown, Charity Doyle, Steve Laurenti, Ritchie Nordstrom, Jordon Mason, and John Roberts are present or former elected Alderpersons, or members of the Common Council, of the City of Rapid City.

17.    Defendant Pauline Sumpton is employed as Finance Officer for the City of Rapid City.

18.    Defendant Jane Doe No. 2 AKA "Connie" is employed in the Finance Office of the City of Rapid City.

19.    Defendant Gary Garner is employed as City Forester for the City of Rapid City.

20.    Defendant Barb Garcia is Director of Community Development, the 2007-created Department which is nominally in charge of Ordinance Enforcement.

21.    Defendant Greg Barbier is Director of the Community Resources Department, within the Community Development Department, apparently with nominal supervisory responsibility for Ordinance Enforcement.

22.    Defendant Brett Limbaugh is Director of Growth Management Department, under Community Resources and Community Development, apparently with nominal supervisory responsibility for Ordinance Enforcement.

23.    Defendants Jane and John Does 3-25 are officials, officers, employees or agents of the City of Rapid City, to be identified, whose acts or omissions caused, in whole or in part, the damages claimed herein.

BACKGROUND AND OVERVIEW

24.    Reints was introduced to Rapid City municipal ordinance enforcement practices in the year 2001 when a man of about 50, dressed in civilian clothes, appeared on the front porch of his home at 234 South Canyon Road, Rapid City, South Dakota, and rang the doorbell. When Reints answered, the man told Reints he had to remove a battery from his front porch. The man waved his arms in the air as he told Reints that the condition of the porch was disgraceful and ordered Reints to make numerous changes as to how the porch was arranged. In response, Reints asked who the man was and on what authority he presumed to give such orders.

25.    Belatedly, the man introduced himself as Jim Martz (Martz), Ordinance
       Enforcement Officer for Rapid City; he did not show any identification. Reints
       asked Martz to identify any ordinance violation physically and by reference to
       specific ordinance. Martz told Reints that wasn't necessary. Reints stated that he
       would not, then, be making any changes. Martz replied that would be costly to
       Reints. Reints excused himself, re-entered his home and closed the front door,
       and Martz went away. Reints never received any notice alleging ordinance
       violation on his front porch.

26.    Again and again, during the ensuing thirteen years, officers and agents of the City
       of Rapid City (City), made coercive demands of, and leveled threats at, Reints,
       both in writing an in person, while failing in nearly every instance to physically
       and specifically identify violations of ordinance and/or code which were
       purportedly the bases of their demands and threats. These officers and agents, on
       each and every occasion of their delivering demands and threats, failed to inform
       Reints of his right to an impartial administrative hearing in connection with their
       non-specific accusations of ordinance violation. Reints was told in one informal
       contact with City Attorney Jason Green (Green) in 2003, "The City does not hold
       hearings."

27.    Reints learned in 2003 that the City's failure to specifically and physically
       identify alleged ordinance violations was not accident or omission but was, rather,
       fully intentional. By refusing to specifically identify alleged ordinance violations,
       the City aimed, as a matter of policy and practice, to cause Reints and other
       citizens to fearfully scurry and try to identify any and all ordinance violations of
       which they might be possibly have been accused on a deliberately vague City
       notice.

28.    The idea, as explained informally to Reints by Green in 2003, was that under
       vague, general threat on the City's post card notices, the recipient would "police

[5]

himself" generally, fearfully, and broadly, rather than narrowly correcting a specific, alleged ordinance violation or violations. "We don't want to have to send a second notice," Green told Reints.

29.   By these means and practices the City aimed and aims to this day, as a matter of policy, to circumvent the explicit notice requirements of state law contained in SDCL §21-10-6, "Abatement of nuisance – Notice required," ignore, blur and nullify the state-law distinction between private and public nuisance so as to unlawfully threaten and wield criminal enforcement powers in even the pettiest of private nuisance cases, to defeat the requirements for notice and due process imposed on it by the United States and South Dakota Constitutions, and to induce in Reints and all citizens a general worry and fearfulness of sudden destruction of property, sudden filing of a lawsuit, or sudden arrest sufficient to ensure compliance and conformity not with actual requirements of ordinance, but with any demand or instruction by any City official concerning the citizen's own private home, regardless of whether the demand or demands be based in law and ordinance or not.

30.   The first ordinance violation notices Reints received during the period 2001-2004, after Ordinance Enforcement Officer Martz' front door visit, were post cards alleging in very general terms some ordinance violation at 234 South Canyon Road. For example, one alleged "noxious matter" without identifying it or its physical location. Another alleged "too tall grass and weeds" without identifying any location. In spectacular promise of future violation of by the City of state law and the Constitution of the United States, these post cards stated that no notice prior to abatement, civil action or criminal prosecution would be provided if there were future violations of any ordinance on the same premises.

31.   Reints responded to these early notices by cutting his grass if it seemed long, and by filing written appeals in which he demanded benefit of impartial hearing. Reints' appeals during this period, all but one, were ignored with no further action

[6]

by the City after they were filed, perhaps because the City "(didn't) hold hearings" or perhaps because whatever was alleged was secretly deemed to have been cured when Reints cut his grass.

32. The City's failure to respond to Reints' written appeals violated Municipal Code in effect at that time, wherein the Rapid City Building Official was designated as the one-person appeal board and was required to notify ordinance violation notice appellants in writing of the results of their appeal. To keep Reints and other citizens in fearful limbo in ordinance enforcement matters was and is the established policy of the City of Rapid City.

33. Finally in 2004, Reints received acknowledgment of one of his administrative appeals, not from the Building Official but from City Attorney Green. It informed Reints that a hearing was scheduled! Reints prepared on the only issue accessible to him, namely whether the City would physically and specifically identify the ordinance violation which it had alleged; and Reints appeared at the appointed time in the office of the City Attorney where he was ushered into a conference room. After a few minutes Green, a stenographer with her machine, and several individuals who proved to be staff from the City Attorney's office, entered the conference room. Green announced that he would act as hearing officer. Reints objected that Green was representing the City and, in effect, prosecuting the alleged ordinance violation for the City and so could not be impartial. Green overruled the objection and commenced the hearing with his staff silently participating in unidentified roles.

34. Reints asked Green to physically and specifically identify the ordinance violation which the notice alleged. Green stated that he would not do so and that the City would not do so. Reints presented argument that the City was obliged to identify the violation(s) it alleged. Green, without answer to or acknowledgement of any element of Reints' arguments, again refused to specifically and physically identify the alleged violation or violations. The same exchange was repeated in different

[7]

forms for about ten minutes. Green repeatedly refused to physically specify the violation alleged. The hearing was adjourned, Green stated that a transcript would be prepared, and, to Reints' knowledge, no further City action was taken concerning the notice and appeal which had occasioned the hearing.

35.    Without consulting anyone else in the room, and without any vote by his office staff members who were seated around the table, Green stated within the hearing that Reints' appeal was denied; and Reints did not receive any related written notice, or any written statement of reasons for denial in writing from the Building Official. Of course there was fear left in the air for Reints, as to what the City might do.

36.    In the hallway outside the conference room when the hearing was over, Green said to Reints that the just-concluded hearing was the first ordinance notice hearing the City had ever held. Though not explicitly stated by Green, Reints clearly understood from Green's demeanor, inflection and tone that Green intended his statement as a rebuke to Reints, with reference to how much trouble Reints was causing.

37.    The unmistakable message of the hearing itself was that no hearing afforded Reints would ever be a real, impartial review, and that no hearing would ever do Reints any good. That was the City's, and Jason Green's, response to Reints' many demands for administrative hearing when he received a post-card notice vaguely asserting some ordinance violation.

38.    The  mock hearing that was actually conducted by Green was, in effect, a denial of Reints' right to hearing, just as the unconstitutionally vague notice which failed to specify any particular, identifiable violation was a denial of the Constitutional and state-law right to notice. The hearing was a "star-chamber" proceeding. It was not before an impartial tribunal, Reints could not meaningfully participate because he did not know of what he stood accused with sufficient particularity to

[8]

defend, wherefore he could not call witness or introduce evidence. Reints did not know the evidence against him. No intelligible reason was given for Green's denial of Reints' appeal, and there was no intelligible relation between Green's summary "denial of" Reints' appeal and any fact whatsoever.

39.     During the same period, 2001-2004, Reints, seeking redress and reform, persistently exercised his First Amendment rights in writing and during office visits to elected and appointed municipal officials. Reints informed City Attorney Adam Altman, his successor in 2003 Jason Green, and Mayors Jerome Munson and Jim Shaw (Shaw) of the state law and Constitutional violations being routinely committed through the City's ordinance notices and enforcement practices.

40.     Reints met with Shaw and Green together in the Mayor's office on one occasion in 2004. The numerous violations, to the time of this meeting, of Reints' right to notice under SDCL §21-10-6 and the Fourteenth Amendment to the U.S. Constitution, and numerous corresponding violations of Reints' Fourteenth Amendment right to administrative hearing, were brought to Mayor Shaw's attention, explicitly and in detail. Reints also tried to persuade Green and Shaw that the City's policy of intimidation caused strong resentment and was therefore ineffective for the purposes of securing obedience to the ordinances in question, that it was generally corrosive because contact with government officials in ordinance enforcement context was "one classroom in the school where attitudes toward government and rule of law are formed," and that the policy was potentially expensive to the City since the practices Reints complained of violated citizens' fundamental rights and thereby exposed the City to costly lawsuits.

41.     Reints urged on Shaw and Green re-drafting of the City's notices to include notice of the right to hearing, and making of provision for fair conduct of hearings. At that time there was no provision in the Rapid City Municipal Code for conduct of administrative hearings in ordinance violation notice administrative appeals.

[9]

Reints' persuasive efforts on the occasions described above including the 2004 Shaw/Green meeting, and at later times, were met with deliberate, patronizing indifference by Mayor Shaw and City Attorney Green, and then with expressions of boredom and annoyance.

42.   No significant change was made by Green or Shaw in the policies of which Reints complained during the period 2001- 2004. The policies of deliberately vague notice, failure to give notice of the right to hearing and denial of hearing, continued as before, until approximately May, 2012, when the City implemented, by ordinance, an actual provision for hearing before an actual appeal board. This followed the South Dakota Supreme Court's decision in *Daly v. City of Sioux Falls.* At the same time the City finally provided for hearings, it shortened the time for administrative appeals, formerly 15 days on nuisance allegations, to five days unless there had been a previous ordinance violation allegation, and three days if there had. This allows abatement to take place before expiration of the time for appeals! City notices for most alleged ordinance violations, since 2010, have had all notice of right to appeal removed. To this day, City notices continue to bear no indication whatsoever of the right to hearing. The City thus attempted in 2012 to create the appearance of conformity to law in its ordinances while continuing its no hearing policy in practice.

43.   There was, however, one small change in the City's notices in 2004, possibly as a result of Reints' efforts: Reints, after the Shaw/Green meeting, received several notices alleging ordinance violation on which the language threatening no notice at all for future ordinance violations at his home had been removed: There had been substituted language threatening no notice in the future should the same ordinance violation as the one vaguely alleged on a given notice ever be committed at the same premises. The change didn't lessen the threat of future violation by the City of state law and of the Constitution. The plain purpose of this threat was intimidation and to convey the message to citizens including Reints, "You are now powerless if the City accuses you, whether you can

[10]

understand the accusation or not."

44.     For the next three years low-grade confrontation continued. Reints would receive
        a notice vaguely alleging some violation. If he found something that probably
        corresponded to the allegation he would correct it, then appeal the notice
        administratively on the ground that it was unconstitutionally vague and demand a
        hearing, with no response from the City. Reints cut his grass regularly and aimed
        to obey all ordinances, as he had stated repeatedly to Shaw and Green he would
        attempt to do. On some of the occasions when he received a vague notice, Reints
        wrote to his Council representatives, the Mayor and the City Attorney to complain
        and ask correction of the policies.

45.     On information and belief, the Rapid City Building Official never conducted a
        hearing on an ordinance violation notice appeal during the decades when the
        Building Official was the one-person appeal board. On information and belief,
        the City never conducted a hearing as part of an ordinance violation
        administrative appeal, until after May, 2012, excepting only the mock hearing
        conducted for purposes of intimidation and retaliation by Green, in Reints' case.

## STATEMENT OF THE CASE

46.     Green's conduct of the mock hearing at which, as hearing officer-without-tribunal
        he refused to identify the specific violation or violations of ordinance of which
        Reints had been accused on a vague City notice, was the first act in a conspiracy
        led by Green, among Green, his Assistant City Attorneys and other City officials,
        employees and agents, in which Reints was singled out, as a class of one, in order
        to harm him specifically, in order to deny him is Fourteenth Amendment rights
        with a vigor and thoroughness which exceeded City practice and policy, and in
        order to retaliate against him for his efforts to exercise his First and Fourteenth

Amendment rights. Subsequent actions by Assistant City Attorneys Joel Landeen (Landeen) and Wade Nyberg (Nyberg) , City Building Official Brad Solon (Solon), and Ordinance Enforcement Officer Andy Chlebeck (Chlebeck) , as well as Solon's subsequent declaration to Reints that in Reints' case no actual code violation was necessary to order Reints to replace his roof,  show clearly that there was a meeting of minds and agreement that Reints was to be harmed, in violation of his fundamental rights, under color of law. In the City actions that followed, again and again one of the above-named individuals would retaliate against Reints for his exercise of First and Fourteenth Amendment rights in relation to another.

47.     On information and belief, no other citizen of Rapid City has ever been subject to such a mock hearing, which was intended to intimidate, to chill the exercise of Reints' First and Fourteenth Amendment rights and to put a stop, by intimidation sufficient to powerfully affect and deter a person of ordinary firmness, to Reints incessant appeals and demands for administrative hearing.

48.     As of the time of the mock hearing and on Green's instructions, the City excluded Reints from its policy of informal contact and explanation prior to any notice alleging violation. That practice was and is advertised as universal City policy on the City's web pages. The combination of suspension, in Reints case, of the City policy of informal contact prior to notice, failure to provide valid notice and, beginning in early 2010, deliberately misdirected notice, was intended to leave Reints helpless to exercise his Fourteenth Amendment rights, and it did in many cases.  By these means the City itself and the conspirators created the phony, intractable problem of Reints as scofflaw, which those officers engaged in a joint effort to harm Reints were able to represent to their administrative superiors, and perhaps to themselves, as proof that unlawful actions were justified.

49.     Until late in 2007, administration of ordinance enforcement activity was vested by ordinance in the Office of City Attorney. The activity of Green, Assistant City

Joel Landeen (Landeen) and others in the City Attorney's office in administering policies which denied Fourteenth amendment rights to all citizens and in singling out Reints, as a class of one, to be aggressively retaliated against, denied his rights, ridiculed, threatened with sudden intrusions of his home and otherwise harmed, cannot be disguised as legal counseling by City attorneys of City employees. With creation of the Department of Community Development in 2007, administration of Ordinance Enforcement was nominally moved to within that new department.

50.     All evidence known to Reints indicates that the change in administrative responsibility described in the just-above paragraph was in name only, with the City Attorney's office continuing in fact to exercise administrative control over Ordinance Enforcement Officers. Each time Reints informally contacted someone in Community Development in an ordinance enforcement matter, he encountered puzzlement and was referred to the City Attorney's office. On information and belief, the nominal change of administrative responsibility was simply slight of hand by Green, who played a key role in drafting the ordinance change, in an effort to cover unlawful actions by Ordinance Enforcement Officers with the cloak of attorney/client privilege.

51.     Green was fully responsible, on paper, as an administrator for actions of City Ordinance Enforcement officers through late 2007; and Mayors Shaw and Alan Hanks were fully informed, by Reints by means of correspondence copies and letters addressed to them, of the systematic violations of Fourteenth Amendment rights that Green continued to commit. These Mayors, and Green insofar as he was the policy maker, spectacularly failed to supervise.     As a trained attorney Green was very well aware of the violations. Green moreover appeared to set the City policy with de facto, and in some cases explicit, approval of the mayors and the Common Council. Green was aggressive leader and participant in the conspiracy against Reints.

52.     In early May, 2007, Reints received three mailed notices from the City. Before
        the month was out Reints had been told by City Building Official, Brad Solon
        (Solon), that "in (Reints') case" no actual code violation was necessary for Solon
        to order Reints, as he did without identifying any code violation, to replace all the
        cedar shingles on his home; Reints had been threatened on the porch of his home
        by a Rapid City Police Department Officer that his home might be demolished if
        he did not clean up implied code and/or ordinance violations which the same
        Officer repeatedly and pointedly refused to identify; and Reints had been charged
        criminally by Assistant City Attorney Joel Landeen first with two violations, then
        in a modified complaint with one violation of a grass-and-weeds ordinance which,
        as Landeen at all times relevant knew and acknowledged to the trial court, Reints
        had timely corrected by cutting his lawn pursuant to the City's notice and its
        terms before the criminal complaint was filed.

53.     Reints had not desisted in his administrative appeals, demands for hearing, or in
        his complaints to elected and appointed officials concerning the City's
        deprivations of his fundamental rights. The "triple whammy" of early May, 2007,
        described in the just-above paragraph, was intended to overawe and finally put a
        stop to Reints' First and Fourteenth Amendment-protected activities. This triple
        whammy involved a meeting of minds and coordination among all City officials
        and agents involved, in order to "get" Reints and punish him by further
        deprivations of his fundamental rights, especial procedural and substantive due
        process and equal protection rights.

54.     As it undertook the criminal prosecution of Reints, the City failed to allege or
        offer proof of a public nuisance. By state law, SDCL §21-10-5(3), no criminal
        prosecution for private nuisance is permitted in South Dakota. More recently, the
        City codified its contempt for the limits the legislature has placed on its powers by
        declaring in a 2007 ordinance that all nuisances are public nuisances. The City's
        actual policy long was, and now stands codified in ordinance as, never mind the

[14]

limitations imposed by SDCL §21-10-5(3).

55. No other citizen of Rapid City has been criminally prosecuted by the City for a private nuisance ordinance violation he or she has timely corrected pursuant to a City notice which plainly stated that, if the alleged violation were not corrected by the re-inspection date, then the City might prosecute. No other citizen of Rapid City has been informed by the Building Official that it didn't matter whether there was an actual code violation, he or she had to spend many thousands of dollars to do what the Building Official ordered anyway. And no other citizen of Rapid City has been threatened by a Rapid City Police officer with demolition of his or her home, if he or she did not correct some violation or violations of code or ordinance which the same Officer repeatedly refused to identify.

56. Mayor Shaw was necessarily aware of all of that went on in May, 2007, and before and after. Reints specifically informed him by Certified Mail and by repeatedly delivering to his office letter copies which showed what was going on. Shaw's participation and supervision, or deliberate failure to supervise despite his oath and his state-law duties, establish clearly that the actions taken to harm Reints by deprivations of his fundamental rights and interfere with his ability to peacefully make and enjoy a home at 234 South Canyon Road had become the official policy and practice of the City of Rapid City. No change in this policy was made by Alan Hanks when he succeeded Shaw as mayor later that year.

57. Here is how the unlawful actions of the City and its agents, described in Paragraph 53, above, came about: Two of the City notices which Reints received in early May, 2007, were post cards initialed by Andy Chlebeck (Chlebeck), one of the Ordinance Enforcement Officers for the City. The first alleged "too tall grass and weeds" without specifying any location, and the second alleged "junked vehicle." At that time Reints had two vehicles in his driveway, his 1990 Honda Civic and his 1989 Plymouth Grand Voyager minivan. Both were currently

[15]

registered with license plates property displayed and both were fully operational.

58.   A few days after he received the early-May grass and weeds notice and well before the stated re-inspection date, Reints located some tall grass and weeds along the edges of his driveway, on the strip between his sidewalk and the street and in his back yard, and cut them. He was about to prepare and deliver his notice of appeal on grounds of vagueness and demand for hearing when, in the early afternoon of May 18, 2007, a Rapid City police officer, accompanied by a man about 24 years old, about 5'9", of slim build, light complexion and wearing a white tee-shirt who remained unidentified throughout, appeared at Reints' front door and rang the doorbell.

59.   When Reints answered, the police officer demanded to see Reints identification. Reints responded that he was of course not obliged to produce identification while peacefully occupying his own home, but that he would almost certainly be glad to cooperate with the officer if he might understand what was going on. The officer, herein designated as Officer John Doe, stated that he was there to make Reints clean up his property.

60.   Reints asked Officer Doe what ordinance or code violation or violations he alleged. Officer Doe waved his hand in the air and said he wanted Reints to "clean up all this." Reints asked Officer Doe what "all this" was. Officer Doe replied by saying there was an inoperable vehicle, which he did not identify. Reints stated that there was no such inoperable vehicle. Officer Doe gestured in the direction of the white Plymouth van in the driveway and asked Reints if it were registered, to which Reints replied it was. Officer Doe next asked if it were operable, and Reints replied that it was. Officer Doe then stated that Reints had neglected a tree which was leaning against and "damaging (a) neighbor's fence." Reints described a small tree on his property, still alive, which had been partially cut through by vandals in the summer of 2005 which was leaning on Reints' own fence, and asked if that was the tree to which Officer Doe referred. Officer Doe said he didn't know. Reints asked Officer Doe to walk with him and identify the tree

[16]

which he alleged was damaging a neighbor's fence. Officer Doe said that he didn't know where the tree was, and that he didn't know which neighbor had complained of some tree damaging his or her fence. Officer Doe did not, at any time during this visit to Reints' home, mention too tall grass or weeds.

61.   Reints asked for a second time what was the "all this" which Officer Doe wanted him to clean up. Officer Doe walked about five steps from where he had been standing on Reints' porch, rubbed his boot on bare spot of earth and said that there was "not much grass." There was not at the time, and is not, any requirement of Rapid City code or ordinance requiring the planting of grass. Without pause Officer Doe then asked if Reints intended to trim the hedge and "clean all this up?" Officer Doe stated that he "didn't know about here, but, up North if you don't clean up the house comes down." Reints repeated for a third time his question as to what Officer Doe was demanding he clean up. Officer Doe said something to the effect of, "All right then," and began, with his unidentified associate, to walk away toward the street. About half-way to the street, Officer Doe turned back toward Reints and said with venom, "Have a good day!"

62.   Reints regarded as outrageous the combination of threatened demolition of his home and failure to identify any violation. So, seeking redress, he wrote and mailed by certified mail a letter seeking discipline of Officer Doe to Mayor Jim Shaw with a copy to Building Official Solon. The copy to Solon was included because Reints' letter addressed to Shaw stated clearly that Reints would appeal, and did appeal, the early-May, 2007, grass-and-weeds and junk vehicle notices. The copy by Certified Mail satisfied the requirement of ordinance that Reints' administrative appeal go to the Building Official. Reints mailed both this letter and its copy by Certified Mail, on May 18, 2007 and they were received at City Hall on the morning of May 21, 2007, a Monday.

[17]

63.     There is no evidence that Officer Doe was ever disciplined in any way. Shaw did
        not reply to Reints' letter. Reints, per normal City practice, never received from
        the Building Official any response to his administrative appeal. But Building
        Official Solon prepared and falsely pre-dated the Notice and Order of "May 18,
        2007," in response to his May 21st receipt of the copy of Reints' letter, so as to
        conceal that the vague Notice and Order signed by Solon were retaliation for
        Reints' administrative complaint to Shaw about Officer Doe's conduct and threat.
        Solon's Notice and Order was mailed to Reints on May 21st. Officer Doe was
        made aware of Reints' letter to Shaw and in response prepared an undated
        "police report" which he entered into Police Department records, in which he
        attempted, as if before the fact, to rebut Reints' letter and deny what he had said
        and done.

64.     After these events, and at the same time Reints' informed Landeen that he would
        sue in federal court, Reints demanded of Landeen in writing that the hard drive
        from the computer on which Solon's Notice and Order had been prepared be
        preserved, since it would show the actual date of preparation. Landeen told
        Reints verbally that wasn't going to happen.

65.     Solon's Notice and Order dated May 18, 2007, was the third notice Reints
        received in early May, 2007. It was an actual letter mailed by first class mail. It
        ordered that Reints correct vaguely-alleged code violations by June 22, 2007.

66.     Solon was the same City officer who was the one-man ordinance violation appeal
        board and who had for years been receiving Reints' appeals of notices and
        demands for hearing without responding to them as required by ordinance.
        Solon's Notice & Order of "May 18, 2007" alleged blocked gutters and, in vague
        language, some non-conforming condition of the roof of Reints' home. Reints
        inspected his gutters, found some minor obstructions from accumulation of
        leaves, and removed them. Reints then phoned the Building Inspection office to

try to arrange to talk to Solon, to try to understand what Solon claimed was wrong with Reints' roof.

67. Solon had citied, in his Notice and Order, Section 304.7 of the International Property Maintence (IPMC) Code. The City had adopted the IPMC and amended it so that determinations of the City's Property Maintenance Appeal Board were "final" determinations, and so that proceedings of this Board, which had authority to confirm orders with tens or hundreds of thousands of dollars of costs in consequence, were conducted "according to Roberts Rules of Order."

68. Section 304.7 of the IPMC required that roofs not admit water in any area where they joined with interior walls or above interior dwelling space. Reints' had laid down his own cedar shingle roof with very conservative construction, over 20 pound roll roofing and 90 pound felt; and Reints knew that his roof did not admit water and did not, by any reasonable interpretation, violate that section of code. When he phoned, Reints was told he could come to the Building Inspection counter and ask for Solon, which Reints did on the afternoon of May 23, 2007. Since Reints knew he was being treated as a troublemaker, and since he believed that the City was frequently violating his fundamental rights in its effort to create fear and force conformity and compliance which had little to do with actual requirements of ordinance, Reints carried a voice recorder in his shirt pocket and lawfully recorded his conversation with Solon, unbeknownst to Solon.

69. Reints, standing at the front counter of the Building Inspection department with Solon on the other side, went through the four provisions of the complaint-cited code section one by one, asking Solon in each instance what violation of that specific provision was being committed. Solon failed to identify a single violation in any of the four sections of Section 304.7 . Solon offered many non sequitur or nonsense answers to Reints' questions. For example, Solon claimed that, on May 10, 2007, he observed branches and pine needles on the roof which did not appear in the detailed photo he claimed he took on the same occasion, which branches

[19]

and pine needles he claimed must necessarily obstruct the gutters. Solon claimed that the "yard (was) so unkept… that there is adverse drainage off the roof."

70.     After many such answers to Reints' questions, most of which concluded with the statement by Solon that Reints had to replace all of the cedar shingles on his roof, Solon plainly stated to Reints that "in your case" no actual violation of code was necessary for him (Solon) to require replacement of the roof.

71.     Solon's statement that in Reints' case no actual code violation was necessary for Solon to exercise the City's power under law to cause obedience to such an order, was an open and explicit declaration that Solon was acting under color of law, not for any legitimate governmental purpose but to single out and "get" Reints in order to do Reints harm to the tune more than $10,000, and to let Reints know that he could not both make his home in peace and continue to exercise his First and Fourteenth Amendment rights. Solon's message to Reints could not be mistaken. It was: You are going to punished one way or another.

72.     Reints attempted to continue to question Solon but was interrupted, about thirty seconds after Solon's statement that in Reints' case no actual violation was necessary, by then-Assistant City Attorney, now-City Attorney Landeen, who walked up to where Solon was standing and ordered that Reints' conversation with Solon end right then. Landeen's office was about 200 feet away from the Building Inspection front counter, separated by many room partitions and closed doors. In order to interrupt as he did, Landeen most likely had been listening to the conversation from a concealed location. The chances of Landeen having appeared behind the Building Inspection office front counter by chance, at that particular time, are extremely low. When Reints approached the Building Inspection front counter to speak with Solon, Solon made a point to mention that he was aware of the grass-and-weeds notice. There was meeting of the minds and

[20]

coordination.

73.    Reints timely appealed Solon's Notice and Order of "May 18, 2007" to the City's
       Property Maintenance Appeal Board, as provided by ordinance, and demanded
       the recusal of Solon, who sat as a non-voting member on the Board. Reints multi-
       page Notice of Appeal sought immediate dismissal of the Notice and Order as
       frivolous and retaliatory. It recited a list of unlawful City practices involved in
       issuance of the Notice and Order.

74.    Reints never received a response to the administrative appeal described in the
       just-above paragraph, contrary to requirements of ordinance. It is doubtful that
       Solon transmitted Reints' appeal to the Board despite his duty to do so, since it
       also included a transcript, with Reints' verified affidavit that the transcript was
       accurate, showing what Solon had said to Reints and including Solon's verbatim
       statement that, in Reints' case, no actual violation was necessary to order Reints
       to replace his roof. The City's response to Reints' appeal of Solon's notice was
       retaliation, including an improper criminal prosecution and further denial of
       Reints' Fourteenth Amendment rights.

75.    On May 29, 2007, a few days after Reints' filed his administrative appeal of
       Solon's Notice and Order of "May 18, 2007," Landeen filed the City's criminal
       complaint against Reints. He was supervised, in doing so, by Green. This was
       part of the City's collateral response to Reints' administrative complaint to Shaw
       and appeal of Solon's order. It was part of the City agents' intended punishment
       of Reints for having effectively recorded Solon's statements, in exercise of
       Reints' First Amendement rights, so as to be able to show what Solon was doing
       under color of law. The criminal complaint was filed without any City action on
       Reints' timely administrative appeal of the grass and weeds notice and while this
       administrative appeal was pending. The grass and weeds notice was the sole basis
       of Landeen's amended criminal complaint. The City dropped the original first

count of its criminal complaint presumably because it did not want to rest the allegation of junk/abandoned vehicle on nothing much. Appended to the criminal complaint were a falsely sworn affidavit by Officer Doe and the undated "police report" which Officer Doe had prepared and filed in the police department as a before-the-fact rebuttal to Reints' letter to Shaw.

76.   Reints defended pro se the criminal action for "too tall grass and weeds" which Landeen filed. Landeen announced that he would seek a jail sentence suspended for Reints. After nearly two years this prosecution was dismissed, at pre-trial hearing, by Seventh Circuit Court Judge John Delany, who stated in his written ruling that the City could not explicitly give notice that it would prosecute only if the alleged violation were not timely corrected, then prosecute anyway after it was. Delaney's comment in his ruling, concerning the status of Reints' administrative appeal when prosecution began, is relevant to the present action. Delaney stated that he could not even tell who were the City staff mentioned on the notice in relation to administrative appeal.

77.   After dismissal of Landeen's criminal prosecution, Reints served the City with statutorily-required notice that he would sue for malicious prosecution; and Reints began to prepare his pleadings for that independent action. But Reints was troubled, whenever he turned to work on the pleadings by recollection of Mr. Lincoln's comment that it was just no good, no matter how right one might be, to try to make a life and a home in a situation of perpetual conflict.

78.   It seemed that as long as Reints would try to make his home in Rapid City, he was likely to be subject to unlawful City actions which he could not accept, so he would have to respond. The City officers singling him out for punishment seemed very determined. As the time deadline for filing malicious prosecution neared, Reints weighed the cost, in loss of enjoyment of his home and loss of enjoyment from normal pursuits, of the City's frequent and aggressive efforts to turn his fundamental rights touching his home, as it seemed to him, into

meaningless, soggy paper mache'.

79.     Reints had been acquainted with several people, including Wisconsin attorney
        Eddie Elson, who had been so drawn into conflict forced on them by illegitimate
        acts of municipal governments that they became unhappy crusaders, a fate Reints
        wished to avoid for himself as he was just entering retirement. Elson, whose law
        practice was focused on municipal and right-to-home-school cases, eventually
        committed suicide.

80.     For a time after the dismissal of Landeen's prosecution, there had been no vague
        notices, and no Gestapo-like visits to Reints' home by City officers. Reints
        decided not to file malicious prosecution on the grounds that the City officers
        should have learned, and maybe had learned, from the dismissal. Reints decided
        to "let sleeping dogs lie" as a test of whether he could make and peacefully enjoy
        a home in Rapid City. Unfortunately, the period of peace proved nothing more
        than a lull in the City's and city officials and agents' aggressive and now-highly
        personal attack on Reints and on his fundamental rights, especially on Reints'
        procedural rights to notice and administrative hearing.

81.     In the early summer of 2010 the City and its agents renewed their attack on
        Reints. Now led by Assistant City Attorney Wade Nyberg, who had assumed
        administrative control of all ordinance enforcement in relation to Reints, some of
        the same City officers and agents who had previously conspired to single out
        Reints in order to harm him suddenly destroyed the broad, living 80-foot-tall
        Chinese Elm in Reints' front yard. This was Reints' principal shade tree.

82.     Chlebeck confirmed to Reints, in a phone conversation on August 18, 2010, that
        Nyberg, at the time of destruction of Reints' principal shade tree, had assumed
        administrative control of all ordinance enforcement related to Reints. Chlebeck
        informed Reints that from then on, by contrast to normal City practice, Reints

[23]

would have to obtain all information concerning the tree "abatement" from Nyberg. Chlebeck confirmed verbally to Reints that Nyberg had been receiving copies of the notices Chlebeck signed and mailed to Reints.

83.   In June, 2010, Nyberg knew that Reints was away from Rapid City. Nyberg had been so informed by Reints and was carrying on an e-mail correspondence with Reints in another matter. Email was being used because, as Reints had explained to Nyberg, Reints was away from his home. Nyberg acknowledged in email to Reints on June 9, 2007, that he was aware that Reints' absence from Rapid City was "prolonged." Nyberg was sufficiently aware that Reints was away to send Reints, by email on June, 9, 2010, a notice alleging too tall grass and weeds at Reints' home. This grass and weeds notice was signed by Chlebeck and issued on or about June 8, 2010.

84.   On June 11, 2010, the City issued a notice, signed by Chlebeck, falsely alleging a "dead tree" at Reints home. Nyberg did not send this notice to Reints by email … until July 23, 2010, after expiration of the seven-day period for administrative appeal stated on the notice. The June 11 dead tree notice was mailed to Reints' home, where Green, Nyberg and Chlebeck knew that Reints, because of his prolonged absence from Rapid City, would not receive it.

85.   On the same day, July 23, 2010, that Nyberg provided Reints the dead tree notice in a manner that Nyberg knew would cause Reints to receive it, namely by email, Chlebeck, in coordination with Nyberg, transmitted to Frank's Tree Service the instruction to destroy the large Chinese Elm in Reints' front yard.

86.   As soon as he could Reints communicated his appeal of dead tree notice and demand for hearing electronically to the one-man appeal board for trees, City Forester Gary Garner (Garner). Reints appeal was denied by Garner on grounds that the 7-day period had run. Garner's denial was transmitted to Reints by email. Garner was the authority for the "dead tree" notice. According to Garner's

[24]

telephone statements to Reints on the afternoon of August 18, 2010, he, Garner, had inspected a tree at Reints house and pronounced it dead, at the request of Chlebeck. The appeal provision on the misdirected, mailed notice provided for appeal within seven days, to Garner, of his own finding. Reints was thus denied notice, appeal and hearing as his principal shade tree, immensely expensive to replace, was destroyed under color of law.

87.     The Supreme Court of the United States, in *Mullane v. Central Hanover Bank Tr.Co*, 339 U.S. 306, 70 S.C. 652, 94 L.Ed. 865 (1950), has settled the issue of whether notice, when it is someone's due, has to be timely provided by means "such as one desirous of actually informing the absentee might reasonably adopt to accomplish it." It does.

88.     Reints large tree had not been dead by any stretch of the imagination, and Reints did his best from a distance to document that fact. He arranged for a Rapid City attorney to take high definition pictures of the stump, which show healthy, green cambium layer on the entire circumference. Reints talked by phone to the owner of Frank's Tree Service, who told Reints that he had visited the site in the morning of the day, July 27, 2010, when it was destroyed by his crew. Reints asked if the tree, when it was destroyed, was covered in green foliage. Frank, who competes with others for the City's abatement business, replied: "I'm not going to shoot myself in the foot."

89.     Reints obtained a verified affidavit from Mike Kettering, his friend who was looking after Reints' house during his absence, which testified that the tree was certainly living and covered in green foliage when it was destroyed.

90.     At the same time as Nyberg and the City officials and agents who were cooperating with him maliciously destroyed Reints' principal, living shade tree, they unlawfully confiscated and stole Reints' currently-registered and licensed, fully-operational 1989 Plymouth Grand Voyager van from the driveway of

Reints' home, on the grounds, which they knew to be false, that it was a junk
abandoned vehicle. These officials, in the same manner as they had for the shade
tree, deliberately and maliciously misdirected a mailed notice, during June, 2010,
so that it would not reach Reints. This notice was never provided to Reints by
email.

91.     An additional measure of the unlawful intent of the City officers involved in the
        removal and effective theft of Reints' van, described in the just-preceding
        paragraph, is their having ignored the requirements of SDCL §32-36-4.1, which
        makes it a criminal misdemeanor to remove an abandoned vehicle from property
        without obtaining the signed permission of the property owner before doing so.
        Reints' permission was never sought nor obtained. In this, as in procedural and
        substantive due process matters, Rapid City routinely takes the position that clear,
        explicit requirements of state law do not apply to it.

92.     Reints demanded in emails and by Certified Mail to Nyberg that his Plymouth van
        be returned. It was not. Reints also gave the City notice of his intention to sue for
        destruction without notice and hearing of his principal shade tree and the theft of
        his Plymouth van. Reints demanded in writing that all evidence touching both
        "abatements" be preserved.

93.     The lawless destruction of Reints principal shade tree and the effective theft of his
        Plymouth van were the "third blast" in the City's, and in the particular City
        officials' and agents' efforts, to "get" Reints, do him harm, retaliate for their
        recent defeat in court at the hands of a layman, and establish that Reints could not
        make a home and continue to exercise his fundamental rights without out facing
        frequent, unlawful attack in the form of ordinance enforcement and abatements
        and property seizures without due process.

94.     It was when Reints tried to obtain photographs showing the alleged tree and van
        ordinance violations, that Chlebeck told Reints that Nyberg was in administrative

[26]

control of ordinance enforcement matters touching Reints. This arrangement, in Chlebeck's words, was "to make sure you are taken care of." Chlebeck told Reints accordingly that Nyberg was the only person from whom Reints could get the photographs he asked for. Chlebeck said he had forwarded his photos to Nyberg. Nyberg, in email correspondence with Reints, claimed only to have received one photograph; and he emailed to Reints a grossly manipulated photo in which everything, including the green leaves on Reints' trees, appeared brown, seen through prismatic brown lines superimposed on the picture. Nyberg, in forwarding the distorted photograph, made no statement about when, or by whom, it was taken.

95.     In emails and by Certified Mail, Reints sought to preserve and exercise his Constitutional and statutory right to appeal and hearing before the Rapid City Common Council (Council) in order to contest the special assessments levied by the City for destruction of his tree and removal of his Plymouth van. In time, Reints learned that there had also been an abatement of alleged too-tall grass and weeds during the period June-July, 2010, and that there had been a special assessment of approximately $370 related to that. These special assessments totaled about $1,200. Nyberg conspired with other City officers and "Connie" and other Jane and John Does in the City Finance office and City government, and successfully sabotaged Reints' very diligent efforts to appeal and be heard before the Common Council, as provided by statute, on these three special assessments.

96.     Reints expected trickery and intentional denial of his right to be heard before the Council and therefore sought to keep track of the special assessment levy step by step, even though he was still away from Rapid City. In several telephone conversations with "Connie" in the City Finance office Reints determined the approximate date the special assessment would be noticed. When it was, Reints attempted to learn the date of the Council meeting at which he could exercise his

right to be heard in his appeal of the assessments. All of this was by telephone.

97. Connie told Reints she didn't know the date and time of the Council meeting at which Reints could be heard on the special assessments. Reints asked Connie to agree to send an email to him at jorntz@gmail.com, as soon as she learned the date. She agreed. To confirm this conversation and take precaution against misunderstanding deliberate or otherwise, Reints sent by Certified Mail to Connie in City Finance his Notice of Appeal of Special Assessment, dated October 13, 2010. This notice repeated what Reints had told Connie on the phone, namely, that the only way he could then receive notice of the date when he might appear before the Council was by email at jorntz@gmail.com.

98. Connie received the Certified Letter Notice of Appeal. Reints made arrangements to return to Rapid City. Weeks passed. Finally, on November 1, 2010, Reints phoned Connie. She said she had weeks before sent an email to the email address "jornpz@gmail.com," informing Reints that the hearing would be on November 1, 2010. Connie insisted to Reints, repeatedly and falsely, that this was the address Reints had given her. Reints pointed out that his Notice of Appeal reiterated the correct email address. Reints requested continuance of the hearing date. Connie said he would have to ask Nyberg, to whom, she stated, she had given Reints' Certified Mail Notice of Appeal of the special assessments immediately when she received it and without reading it. The Notice was marked to her attention, and the special assessment that it appealed was from the City Finance office, on Finance Office stationary. A few days later Reints sent Connie his test of the non-existent email address jornpz@gmail.com. What came back was a "delivery failure notice;" Reints sent Connie a copy and asked Connie if she had not received a similar delivery failure notice. She did not reply. She did not provide Reints, as he asked, a copy of the email she claimed to have sent to jornpz@gmail.com.

99.   Reints next on November 1, 2010, phoned Nyberg, who said to Reints, "Ya know
      what, I just got that (Reints' Notice of Appeal Special Assessment)." Nyberg said
      to Reints that there "really wasn't" any hearing and that the Council meeting at
      which Reints might be heard was that night, November 1, 2010. Both Connie and
      Nyberg were well aware than Reints was 2000 miles from Rapid City. Reints
      asked that the hearing be continued, in light of the City's failure to provide timely
      notice of its date and time. Nyberg said Reints would have to discuss that with
      Connie. Reints told Nyberg that Connie had told him he had to discuss
      continuance with him. Nyberg said no, City Finance would have to decide. Reints
      called Connie back. She said she would talk to Nyberg. When Reints called back
      late afternoon on November 1, he was informed by Connie that Nyberg had
      denied him continuance.

100.  Reints was thus intentionally and maliciously denied exercise of his
      Constitutional and statutory right to be heard before the Council on the special
      assessments totaling about $1200.00. Consistent with his purpose of depriving
      Reints of his hearing right, Nyberg did not present Reints' Notice of Appeal of
      Special Assessment to the Council when it met the evening of November 1, 2010.
      The Council approved the special assessment. Since it was obtained unlawfully
      and since Reints would be hard-pressed to pay it, Reints has not paid this special
      assessment. It has been passed to the County as unpaid taxes to be collected; and
      the County may issue process to force the sale of Reints' home as a result.

101.  On August 20, 2010, in one of several phone conversations Reints had with
      Chlebeck on the occasion of destruction of his principal shade tree and
      "abatement" by the City of Reints' van, Reints undertook to get assurance that he
      would be informed by email, at the correct email address, of any future notices
      alleging ordinance or code violations at his home. Reints said to Chlebeck, in this
      conversation which he recorded, "…you have my email as well. If you have any
      business with me, or any business concerning my house, I believe you are under

an obligation to inform me of that business by email, because you know you can
communicate with me in that way. Regardless of whether you agree with me
about the obligation, will you do so?" Chlebeck replied, "Ah.....that is...I mean, I
sent notices to whatever the record of the owner record shows up at the County... I
sent it to that address..." Reints: "And would..." Chlebeck: "We have your e-
mail address, he informed of that after the fact. Yes, he does have that." Reints:
"And...and would you answer the question that I asked, there. Will you please
send, ah... by the email that you have there in your inbox, ah...any notice or any
business that you have with me? Let me know by email about it." Chlebeck:
"Ah... I can do that." Reints: "Good. Thank you very kindly. Bye." Chlebeck:
"OK."

102.    When this conversation took place, Chlebeck had previously been communicating
        regularly with Reints by email, mostly for the purpose of denying Reints' requests
        for evidence, such as the photographs which ordinarily were provided to any
        citizen accused of ordinance violation who asked.

103.    Three notices alleging ordinance violation were issued by the City since Reints'
        telephone conversation with Chlebeck on August 10, 2010. Chlebeck signed each
        of them. In each case, Chlebeck failed to notify Reints by email of issuance of the
        notice. Reints was away from his home on the occasions of two of these notices,
        and with regard to these same two notices abatements were conducted before
        Reints was aware of the allegations, despite Chlebeck's agreement to use email
        and despite Reints having arranged for Mike Kettering to look after his home
        while he was away. In the case of each notice, Reints informed Chlebeck in due
        course that Chlebeck had failed to notify Reints by email; and Reints pointed out
        to Chlebeck in writing, in each case, that Chlebeck continued to deliberately mis-
        direct notices. This had no corrective effect on Chlebeck's conduct toward Reints
        in the subsequent cases.

104.    With the City's and the conspirators' actions toward Reints in June, 2010, it
        became both City policy and the object of the conspiracy to always deny Reints
        effective notice so as to be able to carry out an abatement before he was aware of
        any allegation of ordinance violation.

105.    The "grass and weeds" notice or notices of June, 2010, were defective on their
        face, as Reints learned when he received them after his return to Rapid City. The
        evolution of language on Reints' notices, and, on information and belief, on all
        City notices alleging ordinance violation, had proceeded to the point where, in
        June, 2010, there was no notice whatsoever of the right to appeal. There continued
        to be no notice of the right to administrative hearing. Reints grass and weeds
        notices did not indicate any location on premises even in general terms such as
        "front yard."

106.    In early 2011, The City, by means of a post card notice signed by Andy Chlebeck,
        alleged ordinance violation at Reints' home because of ice and snow on sidewalk.
        Contrary to his agreement to do so, Chlebeck failed to send to Reints a notice
        copy, or advise that a notice had been issued, by email. Reints was, again, away
        from Rapid City and did not receive the mailed notice, with a three-day appeal
        period, until after the City had ordered abatement and abatement had been
        performed. Reints received the mailed notice of related special assessment for
        207.00 and appealed it. This time, Reints appeared before the Council. Reints
        presented evidence of Chlebeck's agreement to notify by email by playing a tape
        recording of the conversation. Reints stated to the Council that the abatement was
        performed without effective notice, that notice had been deliberately misdirected,
        and that the special assessment was therefore invalid and should be removed by
        the Council from the Tax Role. Two Council members, Sam Kooker and Bonnie
        Peterson, then voted to remove this special assessment from the role, but the
        Council majority voted to include it and the special assessment was levied. It has
        not been paid.

107.    Mayor Hanks was present at the Council meeting described in the just-preceding
        paragraph and heard the audio recording of Chlebeck's agreement with Reints.
        Hanks both previously, and after, received copies of many of Reints
        communications concerning the violation of his rights. He took no action at the
        time of Reints' appearance before the Council, or before or after, to stop the
        City's denials of Reints' due process rights, so that the previous City policy and
        practice as established by Shaw and Green, and the conspirators' efforts to find
        ways to harm Reints, continued without interference by reason of deliberate
        indifference, or participation, of the City's chief executive. The Council took no
        action to stop abuses of right to notice, either in response to hearing the audio
        recording or in response to any of Reints' correspondence with Council members.
        One Council member, Mason Jordon, emailed Reints that he had had his hearing
        before the Council, and that was all the hearing Reints deserved.

108.    On August 21, 2012, the City issued and Chlebeck signed a notice alleging a grass
        and weeds violation at Reints' home. As stated above, Chlebeck did not inform
        Reints by email. Abatement took place before Reints was aware of the notice.
        Reints' notice of appeal of September 2, 2012, is hereby incorporated by
        reference and attached hereto as *COMPLAINT EXHIBIT ONE*. At the time of
        this, Reints' Notice of Appeal of Chlebeck's notice, Reints did not know that
        abatement had already been carried out. Chlebeck did not respond to questions
        and demands for clarification in Reints' notice of appeal.

109.    The notice described in the just-preceding paragraph was the first notice Reints
        received under revised City ordinances, described in Paragraph 43., above. There
        was now an appeal board. In response to Reints' appeal a hearing was scheduled,
        although abatement had already been carried out. Reints wrote to the appeal
        board chairman stating that the abatement had been unlawful, since state law and
        the Constitution required notice and hearing while there was still something to
        have the hearing about. Reints stated to the chairman that he declined to attend
        the hearing as a protest that it was after-the-fact and therefore meaningless; but he

[32]

placed before the appeal board, in writing, one single issue: Was the City required to provide hearing prior to the abatement. The notice signed by Chlebeck did not allege any exigent circumstance, and of course Reints' allegedly too tall grass and weeds, wherever they were, did not pose imminent danger to anyone.

110. The appeal board met at the time noticed for hearing on Reints' Notice of Appeal of September 2, 2012. The minutes show that at no time did the Board consider in any way the single issue which Reints had placed before the Board. By the minutes, Chlebeck testified knowingly and falsely that Reints had been notified and done nothing about the alleged violations. At the time of his testimony, Chlebeck had received Reints' Notice of Appeal of September 2 and so knew what had actually happened. Two appeal board members expressed strong personal prejudice against Reints, one saying that he had complained about Reints every year for ten years. It proved that this member was not Reints' neighbor but drove by Reints' house often. Both this member and another said they were sure Reints' home was uninhabitable and indicated, when cautioned by the Assistant City Attorney present that the appeal board did not have authority to declare Reints' home uninhabitable, that they would act privately outside the hearing to try to force Reints from his home. On Chlebeck's false testimony and the rabid statements of the two board members, the appeal board voted to affirm the City's notice pursuant to which abatement had already been performed. The hearing was notable, judging by the minutes, as the first time in Reints' experience that any City Attorney or Assistant City Attorney acknowledged that there was any due process constraint whatsoever on City ordinance enforcement actions. The City proceeded to impose a special assessment based on the defective notice and ex post facto affirmation of the appeal board. It has not been paid.

111. On August 30, 2011, Solon attempted to conduct a second mock hearing, or star chamber hearing, to punish and ridicule Reints and deter him thereby from suing in federal court as he had informed the City, Landeen and the new Mayor, Sam Kooiker, he would do. Reints received a notice in letter form dated August 30,

2011, stating that Reints was to appear before the International Building Code Board of Appeal. Reints replied in writing to Solon and stated that he had not appealed to that Board. Reints asked Solon on what issues he intended that Reints appear before the Board. Solon did not reply; but he did send a second notice, without explanation, for Reints' appearance before that Board. Reints replied to this second notice by a letter Brett Limbaugh (Limbaugh), who as Director of Growth Management within the new Community Development Department, was theoretically Solon's administrative superior. Reints sent Mayor Kooiker a copy of his letter to Limbaugh. A true and complete copy of the same Reints letter to Limbaugh, dated September 9, 2011, is hereby incorporated and attached hereto as *COMPLAINT EXHIBIT TWO*.

112. Solon never replied to Reints as to issues to be heard before the Building Code board. It was Solon's clear intention to bring Reints to a hearing where Reints had no idea of why he was appearing, or of what issue or question was before the Board, there to confront Reints with some demand or accusation in such way that Reints would be helpless to rebut or refute by evidence of any kind, or witnesses. Mayor Kooiker, in the single instance of which Reints is aware where a Rapid City Mayor has intervened to supervise and stop retaliation intended against Reints by one of the conspirators, responded to the copy of Reints' letter to Limbaugh. Kooiker wrote to Reints and said he wanted to let Reints know that the City had no complaint of ordinance or code violation against Reints at that time. In this way, whatever Solon had cooked up and intended to use to harm Reints was squelched on this one occasion, except for the demonstration to Reints, yet again, that the Building Official continued to seek some way to do him harm. This demonstration, combined with scores of other actions by the City and the conspirators, have caused Reints to live in constant, reasonable fear of some sudden violation of his home under color of law and have caused Reints to conclude that he cannot peacefully make a home in Rapid City.

[34]

113.    In late 2010, as a direct result of the actions by the City and the actions of the
        conspirators recited herein, Reints concluded that he could not peacefully make
        his home in Rapid City without spending a punishing proportion of his time and
        effort simply to defend his fundamental rights. Effective in December, 2011, as a
        direct result of City and conspirator actions recited herein, Reints began
        preparations to move away from Rapid City.

114.    In late 2011, having served notices on the City he would sue for the systematic
        violations of his fundamental rights and destruction of his property without due
        process and in violation of his other rights, Reints attempted to open negotiations
        with Mayor Sam Kooiker (Kooiker) to the settle informally for the harm done to
        him, without a lawsuit. Reints also initiated contact with his Fifth Ward's
        Council members, and with all members of the City Council, for the same
        purpose. The Council would have to approve any settlement.

115.    This exercise of Reints' rights under the First Amendment, described in the
        preceding paragraph, elicited efforts by the City, by Risk Manager L'Esperance,
        by Fifth Ward Alderman Ron Sasso (Sasso), and by "Christine O'Brien," claims
        representative for Travelers Insurance Companies, Inc., first to chill and stifle,
        and then to outright forbid and prevent, any discussion between Reints and his
        elected representatives and thus prevent actual consideration of any petition for
        redress.

116.    The efforts to prevent Reints' petitions for redress from being considered or acted
        on by Council members were successful. Reints might try to persist, but the
        instructions addressed to each Council Member were more than sufficient to 'turn
        off' all possibility of communication and make Reints efforts to negotiate an
        appropriate redress equivalent to talking into a void. "Christine O'Brien" and
        Travelers Insurance Companies Inc. acted with joint purpose and conspired with
        the City, with L'Esperance, and with Sasso to chill and violate Reints' rights

under the First Amendment.

117.   Council members were forbidden to discuss Reints' experiences, the damages he
had suffered and his offer to settle, with him.  When Reints was informed of this
by one of his Ward's Alderspersons, Bonnie Peterson, Reints asked who had
forbidden such discussion. She replied, "Keith L'Esperance."  Reints phoned
L'Esperance and asked if it were true that Council members had been forbidden
to discuss his experience with City officers, the harm done him and his claims,
with him.  L'Esperance replied that it was true.  Reints then asked L'Esperance
who had given Council members those instructions.  L'Esperance replied, "I and
Christine O'Brien."  Council members contacted by Reints would not discuss his
experience with City officers nor his damages nor his offer to settle, with him.
After L'Esperance stated to Reints that he had forbidden Council members to
discuss the subjects of Reints' experience, damages and claims with Reints,
L'Espesperance sent an email to all Council members giving them permission to
discuss other subjects with Reints!

118.   Sasso sent Reints an email categorically and imperatively forbidding Reints to
discuss his experiences with City officers and his claims against the City, with
anyone except Christine O'Brien.  Sasso's email did not threaten any specific
consequences; but in light of past reprisals Reints understood the threat of further
surprise abatements and, perhaps, prosecutions.

119.   Christine O'Brien, in her first contact with Reints, by email, told Reints not to
discuss the matters of harm done him and his claims with anyone but her.
O'Brien pretended to be a judge issuing a gag order. Her statement was clearly
intended to intimidate and isolate Reints, and to prevent him from seeking or
benefiting from legal counsel or exercising his First Amendment rights in relation
to his treatment by the City and the conspiring City officers and agents. Travelers'
insurance coverage of the City does not include coverage for punitive damages,

which both City officers and O'Brien necessarily knew from Reints' correspondence would be sought.

120.   O'Brien joined in the conspiracy to chill and prevent the exercise of Reints' First Amendment rights and to punish and retaliate against Reints for his attempts to exercise said rights.

121.   O'Brien then refused repeatedly to answer Reints' written inquiry if she was an attorney and, when Reints persisted, O'Brien falsely stated to L'Esperance, according to L'Esperance's telephone statatements to Reints, that Reints had refused to provide her information about his claims "because (she) was not an attorney."

122.   O'Brien refused again and again to answer Reints' requests that she let him understand which of the documents that he had provided to San Kooiker and Council members she had received. She then announced to Reints in an email that she had conscientiously investigated his claims and determined that his rights had not been violated, and that no damages were owing him.

123.   By the acts described in Paragraphs 119-122 herein, and by failing to establish communication with Reints based on a bare minimum of mutual respect as a necessary part of her investigation, O'Brien acted in a fully-adversary manner, and in violation of SDCL §58 33-67(1) and other provisions of SDCL §58, in refusing to answer Reints' reasonable questions, in her contacts with Reints generally, in falsely telling the City Risk Manager that Reints had refused communication with her, and in reporting to the City that Reints' claims had no basis.

124.   When Reints told L'Esperance that all of his communications with O'Brien were by email, and that it was a matter of record that he had never said to O'Brien that he would not provide information to her because she was not an attorney nor for

[37]

any reason, L'Esperance asked Reints if he were willing to communicate with
O'Brien. This was black comedy from Reints' point of view, since it was
O'Brien who had failed again and again to answer Reints' emails. Reints so stated
to L'Esperance. Reints could not tell if L'Esperance was putting him on.

125.   Reints' assured L'Esperance that it was not he who had refused communication,
       and that he would be glad to communicate with O'Brien. Reints stated that she
       would, of course, have to at least acknowledge Reints questions about what
       documents she had received. L'Esperance apparently then called O'Brien, and
       Reints sent an email to O'Brien stating that he was very surprised she had falsely
       told L'Esperance that he, Reints, refused communication and that it was because
       she was not an attorney. Reints told O'Brien that he still didn't know if she was
       an attorney. Reints assured O'Brien that he was happy to discuss his claim with
       her. Reints asked O'Brien if she would confirm L'Esperance statement to Reints,
       that she was not an attorney.

126.   O'Brien answered the email but would not and never did answer as to whether she
       was an attorney. O'Brien continued to pretend that she couldn't hear or
       understand Reints' question about what documents she had received. She just
       pressed for a phone conversation, and Reints said that wouldn't be a problem once
       she had answered or at least acknowledged his questions. Reints did not hear
       from her again before her email announcing that his claims had been determined
       to be without merit. O'Brien's conduct generally and her false statement to
       L'Esperance, that Reints had refused communication, and refused communication
       because she was not an attorney, violated SDCL §58, under which O'Brien and
       Travelers Insurance Companies must objectively investigate in good faith any
       claim against them.

## COUNT ONE

### 42 USC §1983 - VIOLATION OF CIVIL RIGHTS

127.   Plaintiff Reints re-states each above paragraph and incorporates the same herein by reference.

128.   At all times alleged herein, Individual Defendants were acting under color of law.

129.   Individual Defendants violated 42 USC §1983 and the Constitution of the United States by negligently, recklessly, indifferently, willfully and wantonly violating Plaintiff's protected Fourteenth Amendment right to procedural due process, including Plaintiff's right to notice and hearing, in City ordinance enforcement, abatement and criminal proceedings against him.

130.   Plaintiff was proximately harmed by these violations.

## COUNT TWO

### 42 USC §1983 - VIOLATION OF CIVIL RIGHTS

131.   Plaintiff Reints re-states each above paragraph and incorporates the same herein by reference.

132.   At all times alleged herein, Individual Defendants were acting under color of law.

133.   Individual Defendants violated 42 USC §1983 and the Constitution of the United States by negligently, recklessly, indifferently, willfully and wantonly violating Plaintiff's protected Fourteenth Amendment right to substantive due process, including Plaintiff's protected liberty interest in his ability to make and peacefully enjoy a home.

134.   Plaintiff was proximately harmed by these violations.

## COUNT THREE

### 42 USC §1983 - VIOLATION OF CIVIL RIGHTS

135.   Plaintiff Reints re-states each above paragraph and incorporates the same herein by reference.

136.   At all times alleged herein, Individual Defendants were acting under color of law.

137.   Individual Defendants violated 42 USC §1983 and the Constitution of the United States by negligently, recklessly, indifferently, willfully and wantonly chilling, suppressing, violating and retaliating against Plaintiff for exercise of Plaintiff's protected First Amendment rights, including Plaintiff's right to petition for redress of his grievances.

138.   Plaintiff was proximately harmed by these violations.

## COUNT FOUR

### 42 USC §1983 - VIOLATION OF CIVIL RIGHTS

139.   Plaintiff Reints re-states each above paragraph and incorporates the same herein by reference.

140.   At all times alleged herein, Individual Defendants were acting under color of law.

141.   Individual Defendants violated 42 USC §1983 and the Constitution of the United States by negligently, recklessly, indifferently, willfully and wantonly violating Plaintiff's protected Fifth Amendment rights, including his right to hearing on, and compensation for, any taking of his property.

142.   Plaintiff was proximately harmed by these violations.

## COUNT FIVE

### 42 USC §1983 - VIOLATION OF CIVIL RIGHTS

143. Plaintiff Reints re-states each above paragraph and incorporates the same herein by reference.

144. At all times alleged herein, Individual Defendants were acting under color of law.

145. Individual Defendants violated 42 USC §1983 and the Constitution of the United States by negligently, recklessly, indifferently, willfully and wantonly violating Plaintiff's protected Fourteenth Amendment right to equal protection of the laws, by rendering Plaintiff a Class of One, singling Plaintiff out and retaliating against him for no legitimate purpose of government in order to "get" him by denying him equal protection of the law.

146. Individual Defendants proximately harmed Plaintiff by these violations.

## COUNT SIX

### 42 USC §1983 - VIOLATION OF CIVIL RIGHTS

147. Plaintiff Reints re-states each above papargraph and incorporates the same herein by reference.

148. At all times alleged herein, Individual Defendants were acting under color of law.

149. Individual Defendants violated 42 USC §1983 and the Constitution of the United States by negligently, recklessly, indifferently, willfully and wantonly conspiring together to violate Plaintiff's protected rights as set forth herein.

150. Individual Defendants proximately harmed Plaintiff by these violations.

## COUNT SEVEN

### 42 USC §1988 - VIOLATION OF CIVIL RIGHTS

151.    Plaintiff Reints re-states each above paragraph and incorporates the same herein
        by reference.

152.    At all times alleged herein, Individual Defendants were acting under color of law.

153.    Individual Defendants violated 42 USC §1988 and the Constitution of the United
        States by negligently, recklessly, indifferently, willfully and wantonly violating
        Plaintiff's protected Fourteenth Amendment right to equal protection of the laws
        by conspiring together in order to knowingly deprive Plaintiff Reints of that
        protection.

154.    Individual Defendants proximately harmed Plaintiff by these violations.

## COUNT EIGHT
## CIVIL CONSPIRACY

155.    Plaintiff Reints re-states each above paragraph and incorporates the same herein
        by reference.

156.    Individual Defendants conspired together and cooperated to negligently,
        recklessly, indifferently, willfully and wantonly harm Reints by deliberate acts,
        including deliberate violations of state and federal law, in order to do Reints harm
        and in order to make it impossible for Reints to peacefully make and enjoy his
        home in Rapid City.

157.    Individual Defendants proximately harmed Plaintiff by these violations.

## COUNT NINE

### SDCL CHAPTER 21 – DUE PROCESS RIGHTS

158.  Plaintiff Reints re-states each above paragraph and incorporates the same herein by reference.

159.  Individual defendants negligently, recklessly, indifferently, willfully and wantonly violated Reints' rights as protected by SDCL §21-10-6, other provisions of SDCL §21, other provisions of South Dakota law and the Constitution of South Dakota.

160.  Individual Defendants proximately harmed Plaintiff by these violations.

## COUNT TEN

### SDCL CHAPTER 58 – INSURANCE COMPANY DUTIES

1.  Reints re-states each above paragraph and incorporates the same herein by reference.

2.  Individuals Defendants negligently, recklessly, indifferently, willfully and wantonly violated their duties to Reints and to each other under SDCL Chapter 58, thereby acting in a fully-adversary manner, and acting jointly with City officers and agents in a conspiracy, to harm Reints by denial of coverage for unlawful destruction and seizure of his property.

3.  Individual Defendants proximately harmed Reints by these violations.

## PRAYER FOR RELIEF

A. For compensatory damages in amount to be determined by a jury for denial of peaceful enjoyment of Reints' home and, more broadly, for denial of the ability to make and peacefully enjoy a home in Rapid City.

B. For damages in the amount of the actual value of Reints' property taken, confiscated or destroyed under color of law, without due process of law, without hearing and without compensation;

C. For punitive damages;

D. For equitable relief as this Court deems appropriate; and

E. For costs and pre-judgment interest.

Dated this _____ day of June, 2013.

John Reints, Plaintiff
234 South Canyon Road
Rapid City, S.D. 57702
910-465-1214
jorntz@gmail.com

[44]